# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 13, 2013 Session

## STATE OF TENNESSEE v. TERESA ANN KINGSMILL

**Appeal from the Criminal Court for Davidson County**
No. 2011-D-3303    Monte Watkins, Judge

**No. M2012-02031-CCA-R3-CD - Filed December 4, 2013**

The Defendant, Teresa Ann Kingsmill, pled guilty to eight charges, all of which stemmed from her possessing or manufacturing methamphetamine. The trial court sentenced her to an effective sentence of twenty-one years. On appeal, the Defendant contends that the trial court erred when it sentenced her because it failed to adequately state its reasoning for the Defendant's sentence in the record. After a thorough review of the record and applicable authorities, we conclude that the trial court did not err when it sentenced the Defendant. We, therefore, affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Teresa Ann Kingsmill.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Robert Homlar, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts and Background

A Davidson County grand jury indicted the Defendant on multiple charges stemming from the manufacture and possession of methamphetamine: one count of initiating the manufacture of methamphetamine; four counts of possession of a controlled substance with the intent to sell within a Drug Free School Zone; one count of conspiracy to manufacture

methamphetamine within a Drug Free School Zone; one count of promoting methamphetamine manufacture; and one count of contributing to the delinquency of a minor. After the State agreed to drop the enhanced punishment mandated by the Drug Free School Zone enhancement, the Defendant entered a plea of guilty to: one count of initiating the manufacture of methamphetamine, a Class B felony; four counts of possession of more than .5 grams of methamphetamine, a Class B felony; one count of conspiracy to manufacture methamphetamine, a Class B felony; one count of promoting methamphetamine manufacture, a Class D felony; and one count of contributing to the delinquency of a minor, a Class A misdemeanor. Pursuant to the plea agreement, the Defendant, who had nine prior felony convictions and qualified as a Career Offender, was to be sentenced as a Range III offender. The plea agreement indicated that the trial court was to determine the length and manner of service of the Defendant's sentence. A transcript of the guilty plea hearing is not included in the record.

The trial court held a sentencing hearing during which the following evidence was presented: the State first noted that the Defendant's applicable sentencing range for her Class B felony convictions was between twenty and thirty years, and that the Class D felony conviction had a sentencing range of eight to twelve years. The State argued that the trial court should sentence the Defendant to the top of her sentencing range because the Defendant actually qualified as a Career Offender rather than a Range III offender and because the offenses occurred in a school zone. The State offered the presentence report.

The State then offered several witnesses, the first of whom was William Loucks, a detective with the Metro Nashville Police Department. Detective Loucks testified that an informant told him that someone by the name of "Shane Oakley" was attempting to purchase pseudoephedrine in order to manufacture methamphetamine. The informant said Oakley had asked the informant to purchase the pseudoephedrine for him. Detective Louks testified that he examined Oakley's history and found that he had recently graduated from drug court after having been convicted of offenses involving the manufacture of methamphetamine.[1]

Detective Loucks, working with the Tennessee Bureau of Investigations ("TBI"), conducted three controlled purchases of methamphetamine. Detective Loucks said he also conducted numerous "trash pulls" from the home where Oakley lived with the Defendant. Detective Loucks said his information showed that Oakley and the Defendant were obtaining all the components and the precursor needed to manufacture methamphetamine in Nashville, but that the cooking was taking place in Benton County. The drugs were then transported back to Nashville and sold to the informant. Detective Loucks said he determined this

---

[1] It appears that a portion of the detective's testimony during the sentencing hearing is missing from the transcript.

through the use of GPS trackers and phone "pings." He said he was able to validate all the information from receipts found in the trash.

Detective Loucks testified that this case involved thirty-five defendants, most of whom were homeless. The Defendant told Detective Loucks that she, Oakley, and others would, "basically, pull up to the homeless shelters" and ask people there who had valid identification to go with them to purchase pseudoephedrine. They would then take four or five individuals to various pharmacies, drop them off, and have them purchase pseudoephedrine.

Detective Loucks testified that one such incident occurred on February 13, 2011, at a Wal-Mart parking lot off of Charlotte Avenue. The detective said he was not present, but the officer at the scene called him and informed him that the Defendant, who had additional people with her, was purchasing pseudoephedrine.

During cross-examination, Detective Loucks testified that he began this investigation because of a confidential informant who had information about Oakley. At the time, Oakley had a prior history of manufacturing methamphetamine, but the Defendant had no such prior history. The detective's investigation led him to believe that Oakley was the leader in the "cooking" aspect of the operation.

The Detective testified that, when he arrested the Defendant, he told her:

I am looking into an investigation with you. . . . First of all, I want to lay out several things: Number one, I have dealt with you for a long time; and, number two Shane Oakley . . . will never lay another hand on you.

He said that he indicated that he would not allow Oakley to hurt her because he was aware there were some "domestic issues" between the two. The detective had spoken with other law enforcement agents who had indicated to him that the Defendant had called and asked for help with these domestic violence issues.

Detective Loucks testified that he repeatedly indicated to the Defendant that he would not allow Oakley to hurt her, and the Defendant was immediately cooperative in the investigation.

During redirect examination, the detective testified that he believed the Defendant still visited Oakley while he was incarcerated.

Courtney Cates, with the Davidson County Sheriff's Department, testified that she was a correctional officer at the female jail facility. She said that, during her employment, she came into contact with the Defendant. Ms. Cates wrote the Defendant up for writing a letter to Oakley. The letter expressed the Defendant's love for Oakley.

Ms. Cates said she spoke with the Defendant while the Defendant was incarcerated, asking her about her charges. The Defendant told Ms. Cates that she had "to do what [she had] to do" because she liked "fast money." The Defendant never mentioned an abusive boyfriend.

During cross-examination, Ms. Cates testified that the Defendant's only write up was for the letter to Oakley. Ms. Cates said the Defendant was a "good inmate" and "[n]ever got in any trouble."

John Holley, with the Davidson County Electronic Monitoring and Drug Testing Unit, testified that the Defendant was required to be electronically monitored as a condition of her bond. His monitoring of her revealed that she had left the county on two occasions, once to travel to Clarksville and once to travel to Erin, Tennessee, both during the weekend of July 3 and 4. Mr. Holley testified that he was aware that the Defendant had family in Erin but he was unaware of her reasons for traveling to Clarksville.

During cross-examination, Mr. Holley testified that one can travel through Clarksville to get to Erin, Tennessee. He said that the Defendant violated her bond requirements by traveling out of county on those two occasions.

Michael Cordine, a Davidson County Community Corrections Surveillance Officer, testified that he was assigned to the Defendant's case to monitor her electronically. The Defendant contacted him to tell him she was going out of the county the weekend of July 3-4. He explained that the Defendant called him from a hospital where she was located and told him that she wanted to stay with her parents for the weekend. He gave her permission to do so. The Defendant then returned after the weekend and was readmitted to the hospital. Mr. Cordine said that he understood the Defendant's medical condition to be "pretty severe," with her having fluid building up in her lungs.

Brandi Jimerson, with Davidson County Community Corrections, testified that she worked with the mental health program, which gave offenders mental health treatment as well as substance abuse treatment. Jimerson testified that offenders in her program are required to meet the usual requirements of Community Corrections, but they are also provided services with psychiatrists and counselors. Ms. Jimerson testified that, if the trial court placed the Defendant in her program, the Defendant would be required to report weekly

to her office and attend group counseling sessions. The Defendant would also have a curfew. Ms. Jimerson testified that the Defendant had been assessed by a counselor with her program and deemed an acceptable candidate for the program. During cross-examination Ms. Jimerson indicated she was aware that the Defendant had participated unsuccessfully in multiple recovery programs in the past.

The parties then stipulated that the testimony of Officer Douglas Fowler would have been:

> That on January 30th, 2011 Officer Fowler was working as an officer with the Metropolitan Police Department. He received a domestic violence call and responded to 14 Brookside Court in Nashville, Davidson County. Upon arriving at the scene, Officer Fowler encountered [the Defendant]. She had visible injuries and was upset. [The Defendant] indicated that she had been in an argument with Shane Oakley regarding their finances. [The Defendant] stated that she was assaulted, grabbed by her hair, and slammed to the floor. Officer Fowler observed physical injuries on [the Defendant], including bruises on her left and right forearms, her right wrists, and cuts and abrasions on her face. [The Defendant] indicated she did not want to prosecute but was in fear of . . . [Oakley.] Officer Fowler took out the attached warrant on behalf of [the Defendant] based on his observations.

Pamela Mary Auble, a forensic psychologist, testified that the Defendant's attorney asked her to conduct a forensic assessment of the Defendant. To conduct her assessment, she reviewed numerous records and conducted some standardized testing. Dr. Auble said that the Defendant's attorney sought information about whether the Defendant had the capacity to form the requisite mental intent to commit a crime or whether she suffered from diminished capacity. Dr. Auble said that her examination revealed that the Defendant did not, in her opinion, suffer from diminished capacity.

Dr. Auble agreed, however, that the Defendant had a history of being physically abused. The Defendant had been in two seriously abusive relationships, the initial one being with her husband. The Defendant's husband abused her so severely that he broke several of her bones. Dr. Auble said that the Defendant "coped" with the abuse by becoming addicted to Lortab. The Defendant's second abusive relationship was with Oakley. They began their relationship in early 2010, and he began abusing her by August 2010. The abuse became much worse later in the year, and, by February 2011, he had become "severely abusive."

Dr. Auble opined that the history of abuse had a "bearing" on the Defendant's decision to commit these offenses. She said that Oakley was a "domineering force" and that,

once he started using methamphetamine, he became "extraordinarily volatile" and "very abusive." Dr. Auble said that the Defendant was afraid she could not leave the Defendant. The doctor said that, while the Defendant had the mental capacity to form intent, she was under the domination of Oakley.

Dr. Auble said that part of the Defendant's motivation was money. The Defendant had hospital bills to pay, and, because Oakley had lost his job, she was the only one supporting them. The Defendant was working eighty hours per week. When her health failed, she could no longer work, rendering the Defendant and Oakley without income. Oakley suggested that they manufacture methamphetamine, and the Defendant agreed.

Dr. Auble testified that the Defendant suffered from bipolar disorder, which had been diagnosed many years prior to her arrest. The Defendant also suffered from post traumatic stress disorder from the physical abuse by her husband. The Defendant was also diagnosed with "opium dependance" and "borderline personality disorder." Dr. Auble said that the Defendant also had a history of substance abuse, criminal convictions, and chronic illness. Dr. Auble opined that the Defendant was a good candidate for a treatment program as opposed to confinement.

During cross-examination, Dr. Auble agreed that the Defendant had entered several treatment programs, all of which worked for a time before the Defendant relapsed. She said that the Defendant was a registered nurse, earning between $2,000 and $3,000 every two weeks. Dr. Auble acknowledged that, after the Defendant's original arrest and release, she was again seen with a group of homeless men at a Wal-Mart. Dr. Auble testified that she had listened to some of the conversations that were recorded by the jail in which the Defendant was confined. In one of them, the Defendant was speaking with a friend about her arrest. She said to her friend that her selling methamphetamine was "about the money." The Defendant then states that Oakley was "beating [her]," so she could not "get out."

The Defendant testified first about leaving the county while she was being electronically surveilled. She said she had a pulmonary embolus in both her lungs and also a "DVT" in her leg. Doctors were concerned about her returning home because she would have to climb several flights of stairs. As such, she called Mr. Cordine and asked if she could stay with her parents for the weekend.

The Defendant explained that she went to see Oakley in jail recently because multiple people had contacted her on his behalf. He wanted her to admit guilt for these charges and not implicate him. She, however, was not going to do so.

The Defendant explained the history of her relationship with Oakley. She said that, at the time they met, she was successfully working as a nurse, attending "NA" and "AA" meetings, and was sober. The Defendant said that she suffered a miscarriage, then she developed "MRSA," and was hospitalized on three separate occasions for those health issues. While she was in the hospital, Oakley expressed his anger that she was going to be unable to work for several months. He informed her of his plan to make money manufacturing methamphetamine, and she agreed to assist him. He showed her how to obtain Sudafed from pharmacies using others to assist in the purchase.

The Defendant testified that, within two weeks of their beginning to manufacture methamphetamine, Oakley's personality changed. The Defendant said she contacted the Humphreys County's police department and informed them that Oakley was changing. On December 8, Oakley hit the Defendant in the face because she was going to throw away the Sudafed in response to his acting "crazy." The Defendant said she contacted law enforcement officers in other jurisdictions to ask for help. She indicated that those officers knew Oakley and his history, so she wanted them to tell her what to do.

The Defendant said that, at one point after Oakley beat her, she contacted her father and sister and asked them for help. They called 911 on the Defendant's behalf. The police were dispatched to her house, but she did not tell them about the methamphetamine because she was "[s]cared to death." The Defendant said that Oakley had broken her arm, but she denied as much to the police who responded because Oakley told her that he would kill her if she told.

The Defendant said that she cooperated fully with police after she was arrested. The Defendant said she willingly joined the conspiracy and was motivated by money. She expressed remorse for her actions. The Defendant asked for long-term help. She asked that the trial court sentence her to community corrections.

During cross-examination, the Defendant testified that she had been caught obtaining a controlled substance by fraud. She was placed on probation and received drug treatment. She then committed the same crime in two different counties. She was again placed on probation and given treatment. After finishing treatment, she went to a fourth county and was arrested for obtaining a controlled substance by fraud. Again she was placed on probation. She agreed she had been to approximately five different drug treatment programs. She also agreed that she did not have custody of her daughter.

The Defendant said that she attempted to call law enforcement officers to inform them that Oakley was manufacturing methamphetamine. They were unable to help her, however, because Oakley was part of a major drug investigation in Davidson County.

Based upon this evidence, the trial court made the following findings:

We have before the Court, a person who has ple[d] guilty to seven felony offenses and one misdemeanor, both of which, if she had been found guilty of those offenses, would have required her to serve thirty years in prison, a minimum of thirty years in prison, at one hundred percent. But because she reached an agreement with the State, she's facing significantly less than that.

The Court has to look at certain factors as a guideline for determining what the sentence may be in this particular case. And with respect to enhancement factors, the Court accepts two enhancement[] factors: One, that she has a prior history of criminal behavio[r] and criminal convictions; and number two, that she was one of the leaders in the commission of the offense involving two or more criminal actors. In this particular case she and Mr. Oakley involved thirty-seven other individuals in criminal behavio[r], all of whom pled to various felony offenses. It may have been one or two misdemeanors. But my recollection is, they all pled to felony offenses.

The Court, also, must look at any mitigating factors. And the Court accepts one mitigating factor, and that is, that she assisted authorities in uncovering this matter.

So, we have two enhancement factors and one mitigating factor. The Court, thus believes that, with respect to Counts One through Eight, the sentence will be twenty-one years. Count Nine, sentence will be nine years. And, of course, Count Forty-eight, the sentence will be eleven months and twenty-nine days. Those will all run concurrently with one another for an effective sentence of twenty-one years at forty-five percent.

The final question is whether this sentence is to serve or to be placed on Community Corrections. The Court considers the nature of the offense, involving a very dangerous drug; the Court, also, considers the fact that a number of individuals were brought into this conspiracy, and, as a result many of them have felony records. Some had records previously. But a number of them are now serving those particular felony sentences as a result of violating probation on a number of those different sentences.

The Court is thus guided by 40-35-103, subsection (1)(b), which states that confinement is necessary to avoid depreciating the seriousness of the offenses and confinement is particularly suited to provide an effective

deterrence to others likely to commit similar offenses. As such, this sentence will be one to serve.

It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it sentenced her because it failed to take into consideration appropriate sentencing considerations. The Defendant contends that the trial court provided only a "very limited analysis" to support its sentencing decision and failed to "properly espouse its reasoning for its sentencing determinations." Accordingly, she asserts that the trial court abused its discretion by not sentencing her to the least restricted alternative, that being community corrections. The State counters that the record supports the trial court's sentencing decision, which was based upon the trial court's finding that there were two applicable enhancement factors and one applicable mitigating factor.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence and the manner of service of that sentence. In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. 380 S.W.3d 682 (Tenn. 2012) The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

Recently, our Supreme Court extended the *Bise* standard to appellate review of the manner of service of the sentence. The Court explicitly held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the

questions related to probation or any other alternative sentence." *Caudle*, 388 S.W.3d at 278-79. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2010).

With regard to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

A defendant who does not fall within subdivision (5) of Tennessee Code Annotated section 40-35-102, "and who is an especially mitigated offender or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." T.C.A. § 40-35-102(6)(2010). Generally, defendants classified as Range II or Range III offenders are not to be considered as favorable candidates for alternative sentencing. T.C.A. § 40-35-102(6) (2010). Additionally, we note that a trial court is "not bound" by the advisory sentencing guidelines; rather, it "shall *consider*" them. T.C.A.§ 40-35-102(6) (2010) (emphasis added).

Even if a defendant is a favorable candidate for alternative sentencing under Tennessee Code Annotated section 40-35-102(6), a trial court may deny an alternative sentence because:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103 (2010).

The Defendant in this case qualified as a Career Offender but was sentenced as a Range III offender in accordance with the plea agreement. Her applicable range of punishment was between twenty and thirty years. The trial court sentenced the Defendant to one year above the minimum sentence based upon two applicable enhancement factors and one mitigating factor.

The trial court ordered the Defendant to serve her sentence in confinement. Because the Defendant was a Range III offender, she was not considered a favorable candidate for alternative sentencing. *See* T.C.A. § 40-35-102(6). The trial court specifically denied the Defendant's request for an alternative sentence based upon the dangerousness of methamphetamine; the fact that the Defendant brought a number of individuals into the conspiracy, resulting in their receiving felony records; to avoid depreciating the seriousness of the offense; and because confinement was particularly suited to provide an effective deterrence to others. After a thorough review, we conclude the record supports the trial court's within-range sentence. We further conclude that the trial court did not err when it ordered the Defendant to serve her sentence in confinement. The Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the above mentioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE